UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | Civil Case No. |
| ) | |
| **$326,461.33 IN U.S. CURRENCY** ) | |
| **SEIZED FROM DOUGLAS** ) | |
| **NATIONAL BANK ACCOUNT** ) | |
| **ENDING IN 6227** ) | |

### VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

COMES NOW the United States of America (the "United States" or the "Government"), by and through Jill E. Steinberg, United States Attorney for the Southern District of Georgia, and J. Bishop Ravenel, Assistant United States Attorney, and brings this Verified Complaint for Civil Forfeiture *In Rem*, with the following allegations:

### NATURE OF THE ACTION

1. *In Rem* civil forfeiture is authorized under Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

2. The Defendant *In Rem* is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C) on the grounds that the Defendant Property, as defined later herein, is any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud in violation 18 U.S.C. § 1343 and wire fraud conspiracy in violation of 18 U.S.C. § 1349, and is any property, real or personal, involved in or attempted to be involved in, or any property traceable to such

- 1 -

property involved in, money laundering in violation of 18 U.S.C. §§ 1956 and 1957 and money laundering conspiracy in violation of 18 U.S.C. § 1956(h).

## THE DEFENDANT *IN REM*

3.     The Defendant *In Rem* (hereinafter, the **"Defendant Property"**) represents the following asset:

> Any and all funds seized from Douglas National Bank account number ending in 6227, in the approximate amount of $326,461.33 in U.S. currency, including any and all accrued interest in the account.

The **Defendant Property** was seized on or about June 14, 2023, from Douglas National Bank in Douglas, Georgia, within Coffee County in the Southern District of Georgia, as the result of federal seizure warrant authorized in the Southern District of Georgia.

## JURISDICTION AND VENUE

4.     The United States brings this action *In Rem* in its own right to forfeit the **Defendant Property**.

5.     This Court has jurisdiction over an action commenced by the United States pursuant to 28 U.S.C. § 1345.

6.     The Court has jurisdiction over an action for forfeiture pursuant to 28 U.S.C. § 1355(a).

7.     The Court has *In Rem* jurisdiction over the **Defendant Property** pursuant to 28 U.S.C. § 1355(b).

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1) because acts and/or omissions giving rise to the forfeiture of the **Defendant**

**Property** occurred in this district, and because the **Defendant Property** was found in and brought into this district pursuant to 28 U.S.C. 1395(b) and (c).

## FACTS AND BASIS OF FORFEITURE

### Background Information

9. This investigation, conducted by the Internal Revenue Service – Criminal Investigation (IRS-CI), involves a scheme to unlawfully obtain various forms of COVID-19 pandemic stimulus relief.

10. During the time period of the crimes alleged in this Verified Complaint, between on or about April 13, 2020, and on or about June 14, 2023, the information contained in this section, titled Background Information, was true and correct.

11. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted on or about March 29, 2020, and was designed to provide emergency financial assistance to the millions of Americans who suffered the economic effects caused by the COVID-19 pandemic.

12. One source of relief provided by the CARES Act was the authorization of up to $349 billion in Small Business Administration ("SBA") guaranteed forgivable loans to small businesses through the Paycheck Protection Plan ("PPP").

13. In or about April 2020, Congress authorized over $300 billion in additional PPP funding.

14. In order to obtain a PPP loan, a qualifying business must have submitted a PPP loan application, which must have been signed by an authorized representative of the business.

15. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative representations and certifications to be eligible to obtain the PPP loan.

16. In the PPP loan application, the small business (through its authorized representative) must have stated, among other things, its: (a) average monthly payroll expenses and (b) number of employees.

17. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.

18. In addition, businesses applying for a PPP loan must have provided documentation showing their payroll expenses.

19. A PPP loan application must have been processed by a participating financial institution (the lender).

20. If a PPP loan application was approved, the participating financial institution funded the PPP loan using its own monies, which were 100% guaranteed by the SBA.

21. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

22. PPP loan proceeds must have been used by the business to pay for certain permissible expenses including payroll costs, interest on mortgages, rent, and utilities.

23. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time (usually 24 weeks of receiving the proceeds) and used at least 60% of the PPP loan proceeds on payroll expenses.

24. The PPP was overseen by the SBA, which was headquartered in Washington, DC, and had authority over all loans.

25. Individual PPP loans, however, were issued by private approved lenders (most commonly, banks and credit unions), which received and processed PPP applications and supporting documentation, and then made loans using the lenders' own funds.

26. Another source of relief provided by the CARES Act was the authorization for the SBA to provide Economic Injury Disaster Loans ("EIDLs") to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.

27. To obtain an EIDL, a qualifying business had to submit an online application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the twelve-month period preceding the disaster, and the cost of goods the business sold in the twelve-month period preceding the disaster.

28. In the case of EIDLs, the twelve-month period was that time period preceding January 31, 2020.

29. The applicant also had to certify that all the information in its application was true and correct to the best of the applicant's knowledge.

30. EIDL applications were submitted directly to the SBA online at https://covid19relief.sba.gov/#/ and processed by the SBA with support from a government contractor.

31. The amount of each EIDL was determined based, in part, on the information provided by the application about employment, revenue, and cost of goods, as described above.

32. Any funds issued under an EIDL were issued directly by the SBA.

33. EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments — collectively referred to as "operating expenses" in the EIDL application.

34. Both PPP and EIDL applications were sent to the SBA through servers located outside the State of Georgia, causing interstate wires begun, continued, and completed in the Southern District of Georgia in this case.

35. The loan process involved transmitting the loan application to and through multiple servers outside the Southern District of Georgia, causing interstate wires begun, continued, and completed in the Southern District of Georgia in this case.

36. Once the loan was approved by SBA, disbursement and payment details were sent to and through servers in Sterling, Virginia, before being distributed to at

least one bank located in the Southern District of Georgia in this case, again causing wires to have begun, continued, and completed in the Southern District of Georgia.

## Overview of Criminal Investigation

37. This forfeiture action stems from the seizure of the **Defendant Property** which is proceeds traceable to and/or derived from wire fraud in violation 18 U.S.C. § 1343 and wire fraud conspiracy in violation of 18 U.S.C. § 1349, and property involved in and traceable to property involved in money laundering in violation of 18 U.S.C. §§ 1956 and 1957 and money laundering conspiracy in violation of 18 U.S.C. § 1956(h), occurring between on or about April 13, 2020, and continuing through on or about June 14, 2023, in Coffee County, within the Southern District of Georgia.

38. The United States discovered the involvement of the **Defendant Property** in these offenses on or about March 2, 2023.

39. Particularly, the **Defendant Property** is forfeitable to the United States, as proceeds traceable to and derived from a scheme and artifice to defraud the United States government by submitting false claims to the United States in support of applications for EIDLs and PPP loans.

40. Kyle Waldron (WALDRON) applied for these loans using a business address in Douglas, Georgia, within the Southern District of Georgia, and these applications caused interstate wires to issue to and from the Southern District of Georgia involving locations outside the state of Georgia.

41. Additionally, WALDRON then layered the proceeds of the wire fraud scheme to conceal and disguise the nature, location, source, ownership, and control of the proceeds and also engaged in monetary transactions of over $10,000.00 per transaction involving the criminally derived property, both in violation of the money laundering statutes listed above and the requirements of the PPP and EIDL programs.

42. WALDRON likely conspired with at least one other person in committing these crimes.

43. WALDRON is the principal of JAK Transport, Inc., a tractor-trailer truck transportation company, and KEL Transport, Inc., d/b/a I Drive Auto Sales, a used car dealership, located in Douglas, Georgia.

44. Evergreen Sales, Inc., located in Douglas, Georgia, is a tractor-trailer truck transportation company purportedly owned by WALDRON's family member.

45. WALDRON is the true owner of and controls Evergreen Sales, Inc.

## PPP Loans and EIDLs

46. WALDRON obtained multiple EIDLs and PPP loans for these entities and himself, as an independent contractor, by submitting false applications to financial institutions and the SBA.

47. On or about May 5, 2020, WALDRON received a PPP loan in the approximate amount of $40,000, through KEL Transport, Inc.

48. On or about May 12, 2020, WALDRON received a PPP loan in the approximate amount of $15,000, using his true name.

49. On or about May 27, 2020, WALDRON received a PPP loan in the approximate amount of $28,315, through JAK Transport, Inc.

50. On or about May 28, 2020, WALDRON received a PPP loan in the approximate amount of $103,353, through Evergreen Sales, Inc.

51. On or about March 18, 2021, WALDRON received a PPP loan in the approximate amount of $142,500, through KEL Transport, Inc.

52. On or about April 16, 2021, WALDRON received a PPP loan in the approximate amount of $20,832, using his true name.

53. On or about April 26, 2021, WALDRON received a PPP loan in the approximate amount of $385,000, through JAK Transport, Inc.

54. On or about May 20, 2020, WALDRON received an EIDL in the approximate amount of $150,000, through Evergreen Sales, Inc.

55. On or about June 12, 2020, WALDRON received an EIDL grant in the approximate amount of $10,000 and an EIDL in the approximate amount of $150,000, through KEL Transport, Inc.

56. On or about June 12, 2020, WALDRON received an EIDL grant in the approximate amount of $15,000 and an EIDL in the approximate amount of $150,000, through JAK Transport, Inc.

57. On or about June 16, 2020, WALDRON received an EIDL grant in the approximate amount of $2,000 and an EIDL in the approximate amount of $34,200, using his true name and the name of a farm associated with him named KBW Farms.

58. In sum, WALDRON received approximately $735,000 in PPP loans, approximately $484,200 in EIDLs, and approximately $27,000 in EIDL grants, for a total of approximately $1,246,200.

59. In applications to support these payments to WALDRON and WALDRON controlled businesses, WALDRON misrepresented the true financial affairs of his businesses.

60. The following table summarizes information submitted by WALDRON in support of the PPP loan applications to obtain the above described PPP loans:

| PPP Loan Application | | | | |
|---|---|---|---|---|
| Business Name | IRS Form Submitted with PPP App | # of Employees | Avg Montly Payroll | Calculated Annual Payroll |
| JAK Transport, Inc. | 2019 JAK Transport F 941 Q4 & F 940 | 32 | 11,326 | 135,913 |
| JAK Transport, Inc. | 2020 JAK Transport F 941 Q 1,2,3,4 | 21 | 154,000 | 1,848,000 |
| Kel Transport, Inc. | 2019 KEL Transport-Letter from Kyle Waldron-No W-2s only 1099s | 3 | 16,000 | 192,000 |
| Kel Transport, Inc. | 2020 KEL Transport F 941 Q 1,2,3,4 | 20 | 57,000 | 684,000 |
| Kyle Banner Waldron | 2019 WALDRON Sch C-Brokerage & 2019 WALDRON Sch C-Auto Sales | 1 | 6,000 | 72,000 |
| Kyle Banner Waldron | 2020 Kyle Waldron Schedule C - Auto Sales | 1 | 8,333 | 99,996 |
| Evergreen Sales, Inc. | 2019 Evergreen Sales Form W-3 | 5 | 41,342 | 496,104 |

61. The following table summarizes information submitted by WALDRON in support of the EIDL grant and loan applications to obtain the above described EIDL grants and loans:

| EIDL Application | | |
|---|---|---|
| Business Name | # of Employees | Gross Revenue 12 Months prior to 1/31/2020 |
| Evergreen Sales, Inc. | 4 | 125,000 |
| KEL Transport, Inc. | 4 | 946,023,000 |
| JAK Transport, Inc. | 32 | 1,329,244,000 |
| Kyle Banner Waldron-KBW Farms | 2 | 85,000 |

Georgia State Records

62. Investigators requested records from the Georgia Department of Labor (GADOL) for JAK Transport, Inc., KEL Transport, Inc., Kyle Waldron, and Evergreen Sales, Inc. for calendar years 2019 through 2021.

63. GADOL produced certain records or indicated that it did not have certain records for these entities.

64. GADOL's response materially conflicts with the representations WALDRON made on his PPP and EIDL applications, as noted in the above charts.

65. For example, the GADOL records show that JAK Transport, Inc. employed only one individual during the first, second, and third quarter of 2019 and paid that individual a total of $20,750.00.

66. On his PPP and EIDL applications, WALDRON represented that JAK Transport, Inc. employed 21 people or 32 people throughout 2019 and 2020, depending on the application, far more than the one person listed in the GADOL records.

67. In addition, GADOL had no record of any employees for JAK Transport, Inc. during 2020 and 2021.

68. Finally, GADOL had no record of any employees for KEL Transport, Inc., Evergreen Sales, Inc., or Kyle Banner Waldron-KBW Farms.

69. On his PPP application, WALDRON represented that KEL Transport employed 20 people throughout 2020.

70. Investigators also requested records from the Georgia Department of Revenue (GADOR) for tax years 2019 and 2020.

71. The GADOR tax records for 2019 show JAK Transport, Inc. reported $1,101,979.00 in gross revenues and $0 in salaries and wages.

72. The GADOR tax records for 2019 show KEL Transport, Inc. had no 2019 or 2020 Forms W-2 on file, reported $112,700.00 in sales revenue during 2019, and $0 sales revenue during 2020.

73. The GADOR tax records for 2019 show WALDRON did not report any income derived from performing work as an independent contractor on his 2019 individual tax return.

74. WALDRON represented that he earned $72,000.00 during 2019 as an independent contractor on his PPP loan application.

75. The GADOL and GADOR records indicate WALDRON fabricated the following IRS forms submitted with the loan applications:

- 2019 JAK Transport Form 941 – Employer's Quarterly Federal Tax Return – Quarter 4

- 2019 JAK Transport Form 940 Employer's Annual Federal Tax Return

- 2020 JAK Transport Form 941 – Employer's Quarterly Federal Tax Return – Quarters 1, 2, 3, and 4

- 2020 KEL Transport Form 941 – Employer's Quarterly Federal Tax Return- Quarters 1, 2, 3, and 4

- 2019 WALDRON Schedule C Profit or Loss From Business

- 2020 WALDRON Schedule C Profit or Loss From Business

- 2019 Evergreen Sales Form W-3 Transmittal of Wage and Tax Statements

76. The information received from the GADOL and GADOR confirms that the above-referenced EIDL and PPP loan applications were materially false.

77. Particularly, WALDRON falsely claimed employees were working for his businesses in order to illegally receive money from the EIDL and PPP loan programs, when in fact they were not.

### WALDRON Concealing and Spending Illegal Proceeds

78. WALDRON funneled large sums of money from the Evergreen Sales, Inc., KEL Transport, Inc., and JAK Transport, Inc. business bank accounts, held at one or more other financial institutions, into the personal account of his wife at Douglas National Bank, the bank account holding the **Defendant Property**.

79. Over $460,000 of the approximately $1,246,000 was traced from PPP loans and EIDL grants and loans into the bank account holding the **Defendant Property**.

80. The following chart summarizes the movement of funds through on or about May 16, 2023, which monetary transactions individually exceeded $10,000 on several occasions and were accomplished by WALDRON and his wife:



81. Prior to the transferring approximately $450,000.00 to the **Target Account** in or about June 2021, the JAK Transport, Inc. $385,000.00 PPP loan disbursement was deposited into the Truist business account ending in 1189 on April 26, 2021.

82. Shortly after the loan proceeds were deposited, WALDRON wrote a $20,000.00 check on or about May 20, 2021, and a $10,000.00 check on or about June 11, 2021, from the JAK Transport account to pay toward the principle of his home mortgage loan at Douglas National Bank, indicating loan proceeds were being used for personal, not business purposes.

83. This confirms that the loan proceeds were not intended, nor were they used, to pay employee salaries and operating expenses.

84. The vast majority of the funds in the bank account which contained the **Defendant Property** consisted of fraudulently obtained PPP loan and EIDL proceeds.

85. Additionally, the bank account which contained the **Defendant Property** received over $10,000.00 in fraud proceeds and was used to conduct additional monetary transactions including several in excess of $10,000.00.

86. Particularly, the following monetary transactions were made from the bank account containing the **Defendant Property** in recent years: $15,000.00 check executed on May 16, 2022 to BMW of Macon, $15,012.08 check executed on July 1, 2022 to E.B. Interiors, and $23,000.00 check executed on January 4, 2023 to I Drive Auto.

87. As indicated above, WALDRON transferred approximately $450,000.00 of PPP loan and EIDL proceeds into his wife's personal bank account at Douglas National Bank in or about June 2021, containing the **Defendant Property**.

88. Shortly after the loan proceeds were transferred, funds were spent on various personal items, indicating the loans proceeds were not being used for business purposes, including but not necessarily limited to the following transactions:

| | | |
|---|---|---|
| 07/21/2021 | $804.45 | Ponte Vedra Lodge and Club |
| 07/27/2021 | $927.77 | Ponte Vedra Lodge and Club |
| 08/13/2021 | $857.00 | Rugs USA |
| 08/23/2021 | $529.29 | Pottery Barn |
| 09/29/2021 | $1,389.00 | Burke Optical |

### WALDRON Interview

89. On or about June 14, 2023, WALDRON was interviewed by IRS-CI Special Agent Jason Dulin and Supervisory Special Agent Roger Garland.

90. The interview was non-custodial and voluntary.

91. WALDRON admitted to the information in the following paragraphs in this section, titled WALDRON Interview, as well as other information during the interview.

92. WALDRON owned and controlled KEL Transport, Inc., JAK Transport, Inc., KBW Farms, and Evergreen Sales, Inc.

93. WALDRON received PPP loans through the above-listed businesses in the preceding paragraph and also received loans individually.

94. WALDRON used his personal computer to complete the PPP loan applications and accessed an online portal at Suntrust bank to complete the applications.

95. After being confronted with discrepancies with the PPP and EIDL applications and the Georgia state records, WALDRON admitted to fabricating the applications and supporting documents including IRS forms and stated he was taking full responsibility for everything.

96. WALDRON stated additional PPP loans received by other family members were actually submitted by him, and that he fabricated those applications including supporting documentation as well.

Conclusion

97. By the foregoing and additional acts, the **Defendant Property** is unlawfully connected to violations of 18 U.S.C. §§ 1343, 1349, 1956, and 1957.

98. Accordingly, the **Defendant Property** is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C).

## CLAIMS FOR RELIEF

### First Claim for Relief
### (Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(C))

99. The United States incorporates by reference the allegations contained in paragraphs 1 through 98 above as if set forth fully herein.

100. The **Defendant Property** is property that constitutes and/or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343.

101. The **Defendant Property** is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

### Second Claim for Relief
### (Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(C))

102. The United States incorporates by reference the allegations contained in paragraphs 1 through 98 above as if set forth fully herein.

103. The **Defendant Property** is property that constitutes and/or is derived from proceeds traceable to a violation of 18 U.S.C. § 1349.

104. The **Defendant Property** is property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

### Third Claim for Relief
### (Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(A))

105. The United States incorporates by reference the allegations contained in paragraphs 1 through 98 above as if set forth fully herein.

106. The **Defendant Property** is property that is involved in a transaction or attempted transaction or traceable to such property in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

107. The **Defendant Property** is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

### Fourth Claim for Relief
### (Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(A))

108. The United States incorporates by reference the allegations contained in paragraphs 1 through 98 above as if set forth fully herein.

109. The **Defendant Property** is property that is involved in a transaction or attempted transaction or traceable to such property in violation of 18 U.S.C. § 1957.

110. The **Defendant Property** is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

### Fifth Claim for Relief
### (Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(A))

111. The United States incorporates by reference the allegations contained in paragraphs 1 through 98 above as it set forth fully herein.

112. The **Defendant Property** is property that is involved in a transaction or attempted transaction or traceable to such property in violation of 18 U.S.C. § 1956(h).

113. The **Defendant Property** is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## CONCLUSION

114. WHEREFORE, the United States of America prays that:

   a. Process of a Warrant for Arrest and Notice *In Rem* be issued for the arrest of the **Defendant Property**;

   b. The **Defendant Property** be forfeited and condemned to the use and benefit of the United States;

   c. The United States be awarded its costs and disbursements in this action and for such other and further relief as this Court deems just and proper; and

   d. That due notice be given to all parties to appear and show cause why the forfeiture of the **Defendant Property** should not be decreed.

Respectfully submitted,

JILL E. STEINBERG
UNITED STATES ATTORNEY

By: */s/ J. Bishop Ravenel*
J. Bishop Ravenel
Assistant United States Attorney
Virginia Bar Number 70250
P.O. Box 8970
Savannah, GA 31412
(912) 652-4422

Case 5:23-cv-00066-LGW-BWC   Document 1   Filed 07/11/23   Page 20 of 20

- 20 -

## VERIFICATION OF COMPLAINT FOR FORFEITURE *IN REM*

I, Special Agent Jason E. Dulin, have read the foregoing Complaint for Forfeiture *In Rem* in this action and state that its contents are true and correct to the best of my knowledge and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This 11th day of July 2023.

Jason E. Dulin
Special Agent
IRS-CI